UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PEREGRINE FALCON LLC, Trustee of the Peregrine Falcon Leasing Trust, and FAST ENTERPRISES, LLC, a New York limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>PIAGGIO AMERICA, INC, a Delaware corporation, and CHARLIE BRAVO AVIATION, LLC, a Texas limited liability company,<br><br>Defendants. | Case No. 1:15-cv-00568-BLW<br><br>MEMORANDUM DECISION AND ORDER |

**INTRODUCTION**

The Court has before it a Motion to Dismiss (Dkt. 7) from defendant Piaggio America, Inc., as well as a Motion to Dismiss (Dkt. 18) filed by defendant Charlie Bravo Aviation, LLC ("CBA"), both asserting a lack of personal jurisdiction in the District of Idaho. Alternatively, both Piaggio and CBA seek to compel arbitration of the dispute. CBA further seeks a change of venue.

**BACKGROUND**

This case arises from the sale of a personal aircraft, and the plane's subsequent crash in Springfield, Illinois. Plaintiffs Peregrine and Fast Enterprises bring contract and tort claims against defendants Piaggio and CBA for the manufacture and sale of the

allegedly defective aircraft. Litigation was initially filed in the Fourth Judicial District of the State of Idaho, for the County of Ada, but was removed to this Court under diversity jurisdiction, as provided in 28 U.S.C. § 1332. *See generally Notice of Removal* at 4, Dkt. 1.

At the heart of this claim is a somewhat complex network of business entities. Piaggio is a Delaware corporation with its principal place of business in West Palm Beach, Florida. *Piaggio Def's Br.* at 3, Dkt. 7. CBA is a Texas limited liability company with its principal operations in Georgetown, Texas. *CBA Def's Br.* at ¶ 14, Dkt. 18-1. Fast Enterprises is a New York limited liability company whose principal office is in Greenwood Village, Colorado, but has operations and agents in Boise, Idaho. *Am. Compl.* at ¶ 2, Dkt. 1-3. Peregrine is an Idaho trust established and existing under the laws of the State of Idaho, which is principally located in Boise, Idaho. *See Am. Compl.* at ¶ 1, Dkt. 1-3.

On December 21, 2012, CBA entered into a sales agreement (Agreement No. 1) to purchase a custom-built P. 180 Avanti II aircraft manufactured by Piaggio. *See Piaggio/CBA Agreement*, Dkt. 7-1. Agreement No. 1 was signed for Piaggio by John M. Bingham, who was identified in the agreement as "President & CEO." *Id.* René Banglesdorf signed for CBA and was identified as a "Managing Member." *Id.* Section 7, paragraph D of the agreement stated that "any controversy or claim between the parties arising out of or relating to this Agreement, or the breach thereof, shall be governed by Florida law and settled by arbitration in Miami, FL. . . ." *Id*

Also on December 21, 2012, CBA contracted to sell the Plane to Fast Enterprises ("Agreement No. 2). *See generally Decl. James Harrison, Exhibit 1-CBA/Fast Agreement*, Dkt. 32-1. Once again, Banglesdorf signed for CBA under her title of "Managing Member," whereas James Harrison signed on behalf of Fast Enterprises under the designation of "Point of Contact." *Id.* Notably, Harrison hand-wrote his address as located in Boise, Idaho. *Id.* Like Agreement No. 1 above, Agreement No. 2 included an identical choice of law and arbitration clause that required the application of Florida law and mandated arbitration in Miami, Florida. *Id.*

Manufacturing delays on the part of Piaggio pushed back the date of delivery. *See First Amendment Sales Agreement*, Dkt. 7-2. On September 23, 2013, Piaggio, CBA, and Fast Enterprises all signed a First Amendment Sales Agreement ("First Amendment"), which acknowledged the existence of both Agreement No. 1 and Agreement No. 2, and expressly stated that all three parties were involved in a "back to back transaction." *Id.* The First Amendment set forth that the manufacturing delays "directly impact FAST ENTERPRISES, making FAST ENTERPRISES a third party beneficiary of Agreement No. 1." *Id.* In essence, the First Amendment reduced the price equally for CBA and Fast Enterprises to compensate for the delays in manufacturing by Piaggio. *Id.* The First Amendment did not identify a choice of law provision, include a forum selection clause, or mandate arbitration.  However, it did confirm that Agreement No. 1 and 2 would, except as explicitly provided in the First Amendment, "remain in full force and effect and unamended by this Amendment." *Id.*

On December 18, 2013, Piaggio, CBA and Fast Enterprises entered into a Second Amendment to the Sales Agreement ("Second Amendment"). *See Second Amendment to Piaggio P.180 Avanti II Aircraft Sales Agreements*, Dkt. 7-3. Much like the First Amendment, the Second Amendment was initiated due to further delays in the manufacturing process and provided additional discounts to both CBA and Fast Enterprises, paid at the expense of Piaggio. *See id.*

In order to compensate for the delays, Piaggio and CBA also coordinated flight coverage for Harrison and other Boise-based Fast employees into and out of Idaho. *See, e.g.*, *Harrison Decl.*, Dkt. 32; *Declaration of Sarah Holman de Leon*, Dkt. 30-2; *Hissam Depo*. at 78:23-79:2, 94:6-16, 102:15-103:1, Dkt. 31-2; *Banglesdorf Depo*. at 68:12-19, 73:8-22, Dkt. 31-3. These trips spanned approximately nine months. *Hissam Depo*. at 102:15-103:1, Dkt. 31-2. The flights were scheduled through Western Aircraft or Mountain Aviation in Idaho. *Id*. at 91:13-93:20. Both CBA and Piaggio emailed Harrison directly in Idaho about the trips, and coordinated with other Boise-based Fast employees by email. *See Declaration of Megan Mooney*, Dkt. 30-9. Additionally, CBA began helping Fast Enterprises screen potential pilots to be based in Boise. *See Harrison Decl.*, Dkt. 32-6–8. In March 2013, Banglesdorf agreed to travel to Boise, Idaho to make travel arrangements, and also agreed to look at hangar space and interview at least two pilots upon Fast's request and at its expense. *Banglesdorf Depo*. at 23:23-24, Dkt. 31-3. However, CBA did not complete these services. *Id.* at 23:1-15; *see also Def's Reply Br.* at 4, ¶ 7, Dkt. 35.

Prior to accepting possession of the Plane, Fast Enterprises entered into an Assignment of Aircraft Sales Agreement with Peregrine on December 19, 2013. *Assignment of Aircraft Sales Agreement*, Dkt. 31-1. The Assignment Agreement recognized the transaction was to "ensure the eligibility of the Aircraft for United States registration with the Federal Aviation Administration. . . " and served as a "modification" of the December 21, 2012 Sales Agreement between CBA and Fast Enterprises. *Id.* Signatories included Martin Rankin, a "Managing Member" of Fast Enterprises and Dan DeKeyrel, a "Manager" of Peregrine; it was "Approved by" CBA and signed by Banglesdorf. *Id.* This agreement assigned all ownership rights of the Plane to Peregrine, and was to be "construed in accordance with the laws of the State of Idaho. *Id.* at ¶ 2.

The record is somewhat unclear how the sale was ultimately consummated. Allegedly, Piaggio delivered the Plane to CBA in Wichita, Kansas (for alleged "accounting reasons") on December 20, 2013. *Banglesdorf Decl.* at 3, ¶ 5, Dkt. 18-2. CBA then transported the plane to Texas. *Id.* Fast Enterprises took possession of the plane in Texas around that time. *Id.* Peregrine then took possession of the Plane in January 2014. *Harrison Decl.*, at 3, ¶ 11, Dkt. 32. However, the FAA "Aircraft Bill of Sale" states that the plane was sold directly from CBA to Peregrine, listing its Boise office and address on December 20, 2013. *Aircraft Bill of Sale*, Dkt. 32-10. Both Peregrine and Piaggio signed a "memo of final delivery and receipt of wire" that listed each company's representatives and the location of delivery as "Denton, Texas." *See Decl. James Harrison, Exhibit 15,* Dkt. 32-15.

On January 31, 2014, the Plane was being operated by Peregrine on a round-trip flight from Boise, Idaho to the "east coast." *Harrison Decl.* at 4, ¶ 21, Dkt. 32. On a stop-over flight from Madison, Wisconsin to Springfield, Illinois, an alleged malfunction with the Plane's landing gear caused the aircraft to make an emergency landing. *Am. Compl.* at 3, ¶ 14–16, Dkt. 1-3. Plaintiffs filed the present claims seeking to hold Defendants liable for the damages resulting from the plane crash.

## ANALYSIS

**1.      Motions to Dismiss**

Both Piaggio and CBA ask the Court to dismiss the claims against them for lack of personal jurisdiction in Idaho. To establish this Court has personal jurisdiction over a defendant, a plaintiff must establish that the assertion of jurisdiction is consistent with Idaho's long-arm statute (I.C. §5-514(a)) and does not offend due process. *See Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987) (interpreting the Idaho long-arm statute). However, the Idaho legislature, in adopting the state's long-arm statute, intended the Idaho courts to exercise jurisdiction to the fullest extent possible under the due process clause of the United States Constitution. *Id.* Thus, the state statutory and federal constitutional limits are "coextensive," and the Court need only determine whether this Court's exercise of personal jurisdiction is consistent with due process. *Id.* A court's assertion of personal jurisdiction comports with due process where the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not

offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S.457, 463 (1940)).

In applying *International Shoe*, the Supreme Court recognizes two categories of personal jurisdiction – general and specific.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A defendant is subject to general personal jurisdiction "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state." *See id.* (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).  That is clearly not the case here, and Plaintiffs appear to acknowledge that.  But Plaintiffs do contend that the defendants are subject to the specific personal jurisdiction of the Idaho courts.

A court may assert specific jurisdiction over an out-of-state defendant "when the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). Plaintiffs may establish a *prima facie* case for specific jurisdiction by demonstrating (1) that defendants have purposefully directed its activities at Idaho, and (2) that their claims against defendants grow out of defendants' forum-related activities. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). If both elements apply, the burden then shifts to the defendants to make a "compelling case" that the exercise of jurisdiction would be "unfair or unreasonable." *Id.*

Plaintiffs bear the burden of proving that the Court has personal jurisdiction over the defendants.  *Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir. 1995). Because the Court

is deciding this matter on the record, without holding an evidentiary hearing, the plaintiffs need only establish a *prima facie* showing of jurisdictional facts to withstand a motion to dismiss.  *See Sher v. Johnson*, 911 F. 2d 1357, 1361 (9th Cir. 1990). In determining whether plaintiffs have made a *prima facie* case, "conflicts between the facts contained in the parties' affidavits must be resolved in plaintiffs' favor." *AT&T Company v. Compagnie Bruxelles Lambert*, 94 F. 2d 586, 591 (9th Cir. 1996), *as amended*, 95 F.3d 1156 (9th Cir. 1996).

### A.    *Piaggios's Purposeful Availment.*

Plaintiffs argue that Piaggio has "purposefully availed itself" of Idaho's jurisdiction by,

> [E]ntering a contract for the sale of an airplane to be based in Idaho, emailing Idaho residents regarding the Plane, negotiating agreement terms with Idaho residents, coordinating flights for Idaho residents to and from Idaho in order to keep the agreement alive, and delivering the Plane to an Idaho entity.

*Pls' Resp. Br. at 11, Dkt. 30.* Although Piaggio does not dispute the alleged conduct, it maintains that such conduct is insufficient for this Court to maintain jurisdiction. The Court disagrees.

The "purposeful availment" requirement ensures that a defendant will not be brought into a jurisdiction solely as a result of "random, fortuitous, or attenuated contacts." *See Burger King Corp.*, 471 U.S.  at 475. Biaggio's contacts with the State of Idaho were not random, fortuitous or attenuated.

"[P]rior negotiations, and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are factors that must be examined in determining whether "the defendants purposefully established minimum contacts within the forum." *Id*. at 479. Here, that analysis establishes that Piaggio "purposefully availed" itself of Idaho's laws in a number of ways:

First, it knowingly entering into a "back to back" transaction with knowledge that Fast Enterprises was the ultimate purchaser.  As such, it was at least implicitly understood that Agreement Nos. 1 and 2 were integrated transactions.  Notably, Harrison, who executed Agreement No. 2 on behalf of Fast as its "Point of Contact," indicated that his address was in Boise, Idaho.

Second, the "back to back" nature of the transaction was explicitly acknowledged, when Piaggio, CBA and Fast Enterprises, all signed the First and Second Amendments Piaggio accepted financial responsibility for the delays in delivering the plane to Fast.

Third, in order to compensate for delays in manufacture Piaggio joined with CBA in coordinating and paying for flight coverage for Fast Enterprise's Boise-based employees into and out of Idaho for a period of 9 months.

Fourth, these flights were arranged with Boise-based air charters.

Fifth, Piaggio and CBA were involved in extensive email communications with Harrison, and other Boise-based Fast employees, to arrange and coordinate flights into and out of Boise during the 9-month delay in delivering the plane.

Finally, it appears that Piaggio knew, both that the plane would primarily be used in Idaho and that Fast had assigned its sales agreement to Peregrine. Indeed, it appears that Piaggio was aware that the Plane would be primarily used in Idaho and actually received payment directly from Peregrine. *See Decl. James Harrison, Exhibit 15,* Dkt. 32-15 (memo of delivery and receipt of wire transfer from Peregrine to Piaggio); *see also Decl. James Harrison, Exhibit 16*, Dkt. 32-16 (email from Banglesdorf to Bingham about providing Harrison a "demo aircraft," citing his location in Boise).

Each of these factors, standing alone may not be sufficient to support an assertion of specific personal jurisdiction.  For example, simply being able to predict you're your goods will reach a forum state, is not enough to establish personal jurisdiction.  *J. McIntyreMachinery, Ltd. v. Nicastro,* 564 U.S. 873, 882 (2011)(plurality opinion). Additionally, the Ninth Circuit has held that "use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state." *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir.1985) (internal quotations omitted). However, the Court's task is not to examine each factor individually.  Rather, it must look at "prior negotiations, and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether "the defendants purposefully established minimum contacts within the forum." *See Burger King Corp.*, 471 U.S.  at 479.  After examining all aspects of Piaggio's contacts with Idaho, the Court is persuaded that the Plaintiffs here

have established a *prima facie* showing of facts sufficient to withstand Piaggio's motion to dismiss.

**B.      *CBA's Purposeful Availment.***

CBA's argument that the claims against it should be dismissed for lack of personal jurisdiction are simpler to resolve for a number of reasons.  First, CBA was the seller under Agreement No. 2 and therefore understood from the outset that it was selling a plane to a Boise-based company.  Second, CBA specifically approved the modification of the original sales agreement which resulted in an assignments of Fast Enterprise's interest to Peregrine.  Third, Banglesdorf, as CBA's representative, traveled to Boise to assist plaintiffs with travel plans.  Fourth, CBA agreed to search for pilots and hangar space for Fast and Peregrine to service a plane which it knew would be based in Boise.  These facts persuade the Court that Plaintiffs here have established a *prima facie* showing of facts sufficient to withstand CBA's motion to dismiss.

**C.      *Plaintiff's Claims Related to the Defendant's Forum-Related Activities.***

The vast majority of the plaintiffs' claims arise under the contractual obligations that Peregrine and CBA entered into with the knowledge that revenue would be derived from the sale of the plane to Fast Enterprises and Peregrine.  *See Assignment of Aircraft Sales Agreement*, Dkt. 31-1. Although the plane crash did occur outside the jurisdiction, the contractual obligations to provide a conforming product directly arise from Piaggio and CBA's business activities in the State of Idaho. Accordingly, the second prong of specific jurisdiction is satisfied.

**D.**    *The Assertion of Jurisdiction over the Defendants is Not Unreasonable.*

Because the plaintiffs satisfied the first two prongs to assert specific jurisdiction, the burden then shifts to CBA to "present a compelling case that the exercise of jurisdiction would not be reasonable." *See Boschetto*, 539 F. 3d at 1016. To determine the reasonableness of exercising specific jurisdiction over a nonresident defendant, the court considers the following seven factors:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F. 3d 1050, 1058 (9th Cir. 2007).

The first element is "largely co-extensive with the purposeful availment prong." *See SpeedConnect LLC*, 960 F.Supp.2d at 1123. Having found that Piaggio and CBA "purposefully availed themselves" of this jurisdiction, the first element favors the plaintiffs and supports the reasonableness of remaining in this forum.

The second factor requires this Court to consider the burden that defendant may face by litigating in this forum. Traditionally travel across the country may have placed a severe burden on the defendant.  However, courts now recognize that "with the advances in transportation and telecommunications and the increasing interstate practice of law, any burden is substantially less than in days past." *Menken*, 503 F. 3d at 1062 (quoting *CE Distrib., LLC v. New Sensor Corp.*, 380 F. 3d 1107, 1112 (9th Cir. 2004)). Indeed,

Piaggio and CBA are a manufacturer and/or distributor of aircraft, and have sent high

level management to Idaho in the course of conduct with the plaintiffs before. *See*

*Banglesdorf Depo*. at 23:23-24, Dkt. 31-3. While this factor favors Piaggio and CBA, it is

not compelling.

Third, this Court is not aware of any sovereignty issues between Texas, Idaho, or

even Florida if deemed applicable. The third factor does not favor either party.

Fourth, the underlying premise of Idaho's long-arm statute is that Idaho has a

"manifest interest in providing an effective means of reparation for its residents tortiously

injured by others." *Lake*, 817 F. 2d at 1423. As a matter of policy, Idaho has an interest in

ensuring goods, particularly potentially dangerous goods like aircraft, are manufactured

and subsequently distributed for its citizens' use in compliance with the contractual

warranties associated with such a transaction. This factor favors the plaintiffs.

Fifth, remaining in this forum is likely the most efficient judicial resolution of the

controversy, although this is not a strong factor either. The Ninth Circuit has "looked

primarily at where the witnesses and the evidence are likely to be located" when

determining the "most efficient resolution" factor. *See Core-Vent Corp. v. Nobel Indus,*

*AB*, 11 F. 3d 1482, 1489 (9th Cir. 1993). Due to the nature of this case, the witnesses and

evidence are all in multiple forums, and travel for the parties involved will be a given in

this lawsuit. However, both the relevant Fast Enterprises witnesses, as well as the

Peregrine witnesses are in Idaho, and the plane was ultimately owned by an Idaho legal

entity. This factor also favors the plaintiffs, albeit slightly.

Sixth, the importance of the forum to the plaintiff's interest in convenient and effective relief is most likely served in Idaho, although an argument can be made that absent this Court's jurisdiction of Piaggio, another forum might be more efficient for the complete resolution of their claim. This factor slightly favors the reasonableness of maintaining jurisdiction in Idaho.

Seventh, the plaintiffs have not disputed the assertion that there are alternative forums in which they could adjudicate their claims. CBA seeks a change of venue to either the Western District of Texas, or alternatively the Southern District of Florida. *See Def's Br.* At 6, Dkt. 18-1. Plaintiffs have not indicated that personal jurisdiction would not exist in either forum, therefore the final factor favors CBA, although not strongly.

In summary, the first, fourth, fifth, and sixth factors all favor the plaintiffs' assertion of jurisdiction, whereas the second and the seventh factors both favor CBA's Motion to Dismiss. However, the existence of other jurisdictions and the defendant's burden of litigating in a "foreign" jurisdiction are relatively minor factors when compared to the remaining factors in favor of the plaintiffs. The Defendants have not met their burden of showing that an assertion of jurisdiction in Idaho is "unreasonable."

**2.     Alternative Motions for Arbitration and Change of Venue.**

Piaggio and CBA ask the Court to compel arbitration. The plaintiffs argue they are not subject to arbitration for three reasons: (1) the arbitration clauses in the agreements violate public policy; (2) Piaggio never reached an agreement to arbitrate with Fast or

Peregrine; and (3) some of the claims are not based on contractual duties, and therefore do not arise out of the agreements.

### A.     *Public Policy*

The agreements each contain a clause stating that any claim arising out of or related to the agreements shall be governed by Florida law and settled by arbitration in Miami, Florida. Plaintiffs' public policy argument is related to the forum selection aspect of the clause. They argue that requiring arbitration in Florida violates both federal and Florida law indicating that enforcement of the forum selection clause contravenes the public policy of the forum in which the suit is brought.

Florida and federal law do not support Plaintiffs' argument.  Plaintiffs suggest that a forum selection clause is unenforceable "if enforcement would contravene a strong public policy of the forum in which the suit is brought." *Plf. Br.*, at 21, Dkt. 30. For this assertion, Plaintiffs cite *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), and note that *Manrique v. Fabbri*, 493 So.2d 437 (Fla. 1986) adopted the rule stated in *Zapata*. The Court in *Zapata* did make the above-quoted statement, but that was not the true holding in *Zapata,* and the court made clear that a public policy was not at issue in that case. In fact, the court cited Judge Wisdom's dissent from the underlying court of appeals decision for the proposition that courts should be careful not to overemphasize the strength of the public policy argument. *Zapata,* 407 U.S. at 16. The true holding in *Zapata* is that a court should enforce a forum selection clause unless the party

challenging the clause can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* at 15.

And this is the rule which the Florida Supreme Court adopted in *Manrique*. In that case, the Florida Supreme Court resolved differences among lower Florida courts in the application of forum selection clauses. On the one hand, a lower Florida court had held that contractual provisions requiring that future disputes be resolved in specified foreign jurisdictions are void as impermissible attempts to oust Florida subject matter jurisdiction. *Manrique,* 493 So.2d at 438 (*citing Huntley v. Alejandre*, 139 So.2d 911 (Fla. 3d DCA 1962). On the other hand, a lower Florida court had held that parties to a contract may agree to submit to the jurisdiction of a chosen forum provided that (1) the forum was not chosen because of one party's overwhelming bargaining power; (2) enforcement would not contravene public policy; (3) and the purpose of such an agreement is not to transfer a local dispute to a remote and alien forum in order to inconvenience one or both of the parties. *Id.* (*citing Maritime Limited Partnership v. Greenman Advertising Associates, Inc.*, 455 So.2d 1121 (Fla. 4th DCA 1984)).

The *Manrique* court disagreed with *Huntley*, but it did not specifically adopt the language from *Maritime* about public policy. Instead, it relied directly on *Zapata* for articulating the standard, and explained, "[w]e hold that forum selection clauses should be enforced in the absence of a showing that enforcement would be unreasonable or unjust." *Id.* At 440. And the court went on to emphasize that "the test of unreasonableness is not mere inconvenience or additional expense." *Id.* at 440, n.4. "[I]t

should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." *Id.* (*citing Zapata,* 407 U.S. at 18).

In support of its holding, the Florida Supreme Court acknowledged the reasons given by the United States Supreme Court in *Zapata* for its standard – that there are "compelling reasons why a freely negotiated private agreement unaffected by fraud, undue influence, or overweening bargaining power should be given full effect," that "such clauses represent efforts to eliminate uncertainty as to the nature, location, and outlook of the forum in which parties of differing nationalities might find themselves," that "such clauses might be vital parts of agreements fixing monetary terms, with the consequences of the forum clause figuring prominently in the parties' calculations," and that the view articulated in *Zapata* "enables freely contracting parties to conduct their interstate and international business affairs more efficiently." *Id.* At 439. The *Zapata* rule is "based on a realistic assessment of modern commercial culture, and . . . enhances contractual predictability within that culture, [thus] it is not surprising that it is rapidly becoming a majority view." *Id.*

Plaintiffs have not shown that enforcement of the forum selection clauses in the arbitration agreements would be unreasonable or unjust. Nor have they shown that the clauses are invalid because of fraud or overreaching. There is no indication that the

sophisticated parties in this case did not freely negotiate the clauses as a means for these companies to conduct their interstate business affairs more efficiently. Accordingly, under both federal and Florida law, the Court finds that the arbitration clauses are not void.

Plaintiffs also argue that the forum selection clauses are unenforceable because they contravene public policy under Idaho law. This argument is a non-starter. There is no question that Florida law applies given the clear language that "[a]ny controversy or claim between the parties arising out of or relating to this Agreement, or the breach thereof, shall be governed by Florida law . . . ." Agreement Nos. 1 & 2, Terms and Conditions, Dkts. 7-1 and 32-1. As explained above, Florida law requires enforcement of the arbitration clauses notwithstanding any public policy argument.

### B.    *Piaggio/CBA Arbitration Clause and Fast and Peregrine*

Plaintiffs next argue that the arbitration clause in the Piaggio/CBA agreement does not apply to Fast or Peregrine. They argue that neither Fast nor Peregrine was a signatory to the Piaggio/CBA Agreement, and that the amendments do not modify the arbitration clause in the Piaggio/CBA agreement to add Fast or Peregrine to the clause. The argument is essentially based upon the notion that the Piaggio/CBA arbitration provision is expressly limited to "the parties" and therefore cannot be extended to Fast or Peregrine whether or not either is a third-party beneficiary of that agreement. Plaintiffs thus argue that Piaggio has no basis to compel Fast or Peregrine to arbitrate the claims.

There is no doubt that neither Fast nor Peregrine are parties to Agreement No. 1. *See Piaggio/CBA Agreement*, Dkt. 7-1. There is also no doubt that the arbitration clause is limited to the "parties" to Agreement No. 1 – Piaggio and CBA. *Id.* at Section 7(D). But there is also no doubt that Fast and Peregrine (Peregrine as an assign of Fast) are parties to the First and Second Amendments to Agreement No. 1. *See First and Second Amendments,* Dkts. 7-2 and 7-3. And the First Amendment states that Fast is a third party beneficiary of Agreement No. 1. *First Amendment,* Dkt. 7-2.

But as merely a third party beneficiary, Fast (and Peregrine as an assign of Fast) are not bound to the arbitration clause because it applies only to the "parties" to Agreement No. 1. *Lewis v. CEDU Educational Services Inc.,* 15 P.3d 1147 (Idaho 2000); *Rath v. Managed Health Network, Inc.,* 844 P.2d 12 (Idaho 1992).[1] Both *Lewis* and *Rath* make clear that if a third party beneficiary does not sign an agreement which compels arbitration as to the parties, then the third party beneficiary is not bound to arbitrate. *Rath,* 844 P.2d at 13; *Lewis,* 15 P.3d at 1151. Although Fast did not become a third beneficiary in the manner described in *Rath* and *Lewis* (In *Lewis* the third party beneficiary was the minor child beneficiary of a contract between his mother and an educational service provider, and in *Rath* the third party beneficiary was a covered employee to a group

---

[1] In considering whether Fast and Peregrine, as third party beneficiaries to Agreement No. 1 are bound by its arbitration clause, the Court will rely on Idaho law and ignore the choice of law provisions in Agreement No. 1 because neither Fast nor Peregrine were signatories to that agreement.

services contract) the Court will not question the parties' own designation of Fast as a

third party beneficiary in the First Amendment. And the Court will apply Idaho law as

stated – a third party beneficiary is not subject to an arbitration clause expressly

applicable to the "parties" to the agreement. Accordingly, Piaggio cannot compel Fast or

Peregrine to arbitrate. But CBA may compel Fast and Peregrine to arbitrate pursuant to

the arbitration clause in Agreement No. 2.

### C.      *Claims Subject to Arbitration*

Plaintiffs next argue that the non-contractual claims are not subject to arbitration.

Two types of arbitration provisions have emerged – those that are narrow in scope, and

those that are broad in scope. *Jackson v. Shakespeare Foundation, Inc.,* 108 So.3d 587,

593 (Fla, 2013). Those that are narrow in scope typically require arbitration for claims or

controversies "arising out of" the subject contract, limiting arbitration to claims which

have a direct relationship to a contract's terms and provisions. *Id.* Those that are broad in

scope typically require arbitration for claims or controversies "arising out of or relating

to" the subject contract. *Id.* The additional "relating to" language broadens the scope of

the arbitration provision to include claims which are described as having a "significant

relationship" to the contract regardless of whether the claims are founded in tort or

contract law. *Id.* The arbitrations clauses in the agreements here are of the broad type.

A "significant relationship" between a claim and an arbitration provision does not

exist simply because the parties have a contract. A "significant relationship" exists "if

there is a 'contractual nexus' between the claim and the contract." *Id.* A "contractual

nexus" exists where "the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract." *Id.* "More specifically, a claim has a nexus to a contract and arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship." *Id.* A claim does not have a nexus to the contract where "it pertains to the breach of a duty otherwise imposed by law or in recognition of public policy, such as a duty under the general common law owed not only to the contracting parties but also to third parties and the public." *Id.*

The wrongful death claim in *Seifert v. U.S. Home Corp.,* 750 So.2d 633 (Fla. 1999) cited by Plaintiffs is an example of the latter. In that case, the Florida Supreme Court examined whether the negligence claim in a wrongful death action was within the scope of a broad arbitration provision in a contract for the sale of real property. *Id.* (*Citing Seifert,* 750 So.2d at 635). The court concluded that a significant relationship did not exist between the negligence claim and the contract, and therefore was not within the scope of the arbitration provision. *Id.* at 594. The court reasoned that negligence-type claims do not have a significant relationship to a contract because they are "founded in the tort of common law negligence and [are] unrelated to any unique legal duties imposed under the contract. . . ." *Id.* No contractual nexus existed between the wrongful death claim and the contract. *Id.*

In contrast to *Seifert*, the claims in this case are inextricably intertwined with the contracts. Claims such as those for breach of warranty and rejection or revocation of

acceptance of non-conforming goods arise directly out of the circumstances that surrounded the contractual transaction. They would not exist but for the contracts, and resolution of the claims requires either reference to, or construction of, the contracts. Accordingly, the Court finds that the non-contractual claims are also subject to arbitration.

Finally, Plaintiffs ask this Court to retain jurisdiction and order that any arbitrable claims be arbitrated in Idaho because the forum selection clause is void. However, as discussed above, the forum selection clause is not void. Accordingly, the Court will deny the request.

### D.    Venue

CBA makes a conclusory argument that the Court should transfer venue to Texas or Florida if the Court does not dismiss the case for lack of jurisdiction. CBA says it would be more convenient for the parties. Given the Court's determination that the claims shall be arbitrated in Florida, the Court finds the argument without merit – especially since CBA also asked for the alternative ruling in favor of arbitration in Florida. The Court's ruling is in line with the Ninth Circuit's direction that transfer of venue pursuant to 28 U.S.C. § 1404(a) is left to the sound discretion of the trial court. *Ventress v. Japan Airlines,* 486 F.3d 1111, 1118 (9th Cir. 2007).

## CONCLUSION

This Court has jurisdiction over the claims. But the arbitration clauses in Agreement No. 2 are enforceable against the Plaintiffs, and the Plaintiff's claims against

CBA must be arbitrated in Miami, Florida, applying Florida law. However, the arbitration clause in Agreement No. 2 is not enforceable against the Plaintiffs, and the Plaintiffs may pursue their claims against Piaggio in this forum. However, in the interest of efficiency the parties should seriously consider arbitrating all claims. To that end, the Court will give the parties 30 days to provide the Court with their positions on how they intend to proceed with Fast and Peregrine's claims against Piaggio. Accordingly, the Court will also deny without prejudice National Union Fire Insurance Company of Pittsburgh's Motion to Intervene until the parties report on how they intend to proceed.

## ORDER

### IT IS ORDERED:

1. Defendant Piaggio America Inc.'s Motion to Dismiss (Dkt. 7) is **DENIED in part** and **GRANTED in part** as explained above.

2. Defendant Charlie Bravo Aviation, LLC's Motion to Dismiss (Dkt. 18) is **DENIED in part** and **GRANTED in part** as explained above.

3. National Union Fire Insurance Company of Pittsburgh's Motion to Intervene (Dkt. 16) is **DENED without prejudice**.

DATED: August 24, 2016

B. Lynn Winmill
Chief Judge
United States District Court