UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PEREGRINE FALCON LLC, Trustee of the Peregrine Falcon Leasing Trust, and FAST ENTERPRISES, LLC, a New York limited liability company,<br><br>        Plaintiffs,<br><br>            v.<br><br>PIAGGIO AMERICA, INC, a Delaware corporation,<br><br>        Defendant. | Case No. 1:15-cv-00568-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |
| v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania company,<br><br>        Intervenor. | |

## INTRODUCTION

Pending before the Court are three summary judgment motions: Plaintiffs'

Motion for Partial Summary Judgment (Dkt. 95); Defendant Piaggio America

Inc.'s Motion for Summary Judgment or Partial Summary Judgment against

Plaintiffs Peregrine Falcon LLC and Fast Enterprises LLC (Dkt. 97); and

Defendant Piaggio America Inc.'s Motion for Summary Judgment or Partial

Summary Judgment Against Intervenor National Union Fire Insurance of

Pittsburgh, PA (Dkt. 98). Each motion has been fully briefed and oral argument

was held on the motions on December 17, 2019. For the reasons that follow, the

Court will grant Plaintiffs' motion, will deny Defendant's motion as to Plaintiffs,

and will deny Defendant's motion as to the insurance Intervenor.

## BACKGROUND

### A.     The Airplane and How it Was Damaged

The claims in this matter pertain to damage to a custom-built passenger

airplane. On January 31, 2013, the airplane at issue was damaged when the landing

gear retracted after the airplane landed in Springfield, Illinois. Dkt. 95-4 at 2.  The

pilot of the airplane aborted a landing attempt because the landing gear would not

lower through use of the hydraulic landing gear system. Dkt. 95-4 at 2. The pilot

and co-pilot initiated an emergency override of the hydraulic system. *Id.* To do so,

they turned off the hydraulic system and used a hand pump to manually lower the

landing gear. *Id.* Because the hydraulic system was needed for operation of the

airplane's power steering and power braking systems, the pilots decided to

reengage the system prior to landing. *Id.* at 2-3. With the hydraulic system

reengaged, the pilots successfully landed the airplane and slowed it to walking

speed. *Id.* at 3. At that point, the landing gear retracted, and the airplane's body struck the ground. *Id.*

After the incident, the National Transportation Safety Board (NTSB) produced an accident investigation report. (Dkt. 95-4.) The report details that the Federal Aviation Administration (FAA) conducted an examination of the airplane. *Id.* at 9. The FAA investigators found that the landing gear retracted when the hydraulic system was turned on—even when the landing gear selector handle was in the "gear down" position. *Id.* The FAA investigators removed the hydraulic pump package from the airplane and used a computed tomography (CT) scan to document the internal conditions of the system. The CT scan showed a single metallic particle between a spooling mechanism and the directional housing that controls whether the landing gear is in a lowered or raised position. *Id.* The FAA investigators found that the particle resulted in a jammed spool mechanism, which allowed hydraulic fluid to flow into the landing gear retraction lines. *Id.*

Significantly, the FAA's "review of materials used in the directional control valve did not match the material composition of the trapped particle." *Id.* at 10. In other words, the particle did not come from any of the materials used to manufacture the internal parts of the hydraulic system. Somehow it was introduced into the valve from an external source.

**B.      Relationships between Entities**

An understanding of the relationship between the entities involved in the manufacture, sale, delivery, and management of the airplane is essential to the Court's analysis of the pending motions. The airplane was manufactured in Italy by Piaggio Aero Industries, S.p.A. ("Piaggio Italy") *See Cert. of Airworthiness*, Dkt. 97-27 at 2. Piaggio Italy is not a party to this action.

Defendant Piaggio America, Inc., is a Delaware corporation. ("Piaggio" or "Piaggio America"). Dkt. 97-25 at 3. Piaggio is a sales and support organization for Piaggio Italy. Dkt. 97-26. According to Piaggio, it "takes possess [sic] of the aircraft to sell and deliver to a buyer after the aircraft has been built, tested, inspected, and issued a Certificate of Airworthiness." *Id.*

Charlie Bravo Aviation, LLC ("CBA")—is a Texas company that brokered the sale of the airplane for Plaintiff Fast Enterprises, LLC ("Fast"). Dkt. 97-15 at 2-3; Dkt. 97-25 at 3. CBA is not a party to this action. Fast is a New York private flight chartering company with operations in Boise, Idaho. Dkt. 97-25 at 3.

Plaintiff Peregrine Falcon, LLC ("Peregrine") is the Boise, Idaho company that was assigned the sales agreement executed by CBA and Fast. Dkt. 97-18. The assignment resulted in Fast's title to the airplane being transferred to Peregrine.

Finally, Mountain Aviation Incorporated was the agent for Fast and Peregrine that provided management services for the airplane at issue, including

providing flight crews and maintenance services between flights. Dkt. 97-25 at 4. Mountain Aviation is not a party to this suit.

## 1. The Agreements

A cursory understanding of the four written agreements related to the manufacture, sale, and delivery of the airplane is also essential to the Court's determination of the pending motions.

### a. Sales Agreement 1

On December 21, 2012, Piaggio and CBA entered into a sales agreement for the purchase of the airplane, a Piaggio 180 Avanti II aircraft ("Agreement 1"). Dkt. 97-9. Agreement 1 is entitled "Piaggio P.180 Avanti II Sales Agreement." *Id.* at 2. Agreement 1 identifies the Seller as "Piaggio America, Inc. ("Piaggio")" and the Buyer as "Charlie Bravo Aviation." *Id.* Agreement 1 includes the purchase price for the airplane, $7,455,572, payment terms, and the timeframe for delivery. *Id.* In addition, Agreement 1 includes other special terms, an interior definition process, and terms and conditions that incorporate warranties and warranty limitations. *Id.* at 2-3.

### b. Sales Agreement 2

Also on December 21, 2012, CBA and Fast entered into a sales agreement for Fast's purchase of the airplane from CBA ("Agreement 2"). Dkt. 97-10 at 2. Like Agreement 1, Agreement 2 was entitled, "Piaggio P.180 Avanti II 1Sales

Agreement." *Id.* Agreement 2 identifies "Charlie Bravo Aviation ("CBA")" as the

Seller, "Fast Enterprises" as the Buyer, and "Piaggio" as the Manufacturer. *Id.*

Agreement 2 indicates the total purchase price for the airplane to be paid by Fast

was $6,750,000. *Id.* Agreement 2 contains many of the same terms and conditions

as Agreement 1, with some differences. *Id.* at 2-14.

According to the declaration of René Banglesdorf, the president of CBA, the

sale of the airplane took the form of a "back to back" transaction, common in the

industry. Dkt. 97-15 at 3. CBA acted as an intermediary between Fast and Piaggio.

Ms. Banglesdorf identified Piaggio as "the manufacturer." *Id.* Simply put, CBA

bought the airplane from Piaggio under Agreement 1 and Fast bought the airplane

from CBA under Agreement 2.

    *c.* Amendment 1

On September 23, 2013, Piaggio, CBA, and Fast Enterprises executed a

document entitled "First Amendment to Piaggio P.180 Avanti II Aircraft Sales

Agreements" ("Amendment 1"). Dkt. 106-4 at 2. Amendment 1 acknowledged the

existence of Agreement 1 and Agreement 2, and described the "back to back

transaction" where Piaggio would transfer the title of the airplane to CBA, and

CBA would immediately transfer the title of the airplane to Fast. *Id.* Amendment 1

also acknowledged that Fast was a third party beneficiary to Agreement 1. The

Amendment reduced the purchase price defined in Agreement 1 based on a

delivery-delay formula centered around the profits Fast would lose. *Id.*

Amendment 1 was signed by representatives of all three companies. *Id.* at 3.

      *d.* Amendment 2

On December 18, 2013, Piaggio America, Inc., CBA, and Fast Enterprises,

entered into a document entitled, "Second Amendment to Piaggio P.180 Avanti II

Aircraft Sales Agreements" ("Amendment 2"). Dkt. 97-11. Like Amendment 1,

Amendment 2 acknowledges that Piaggio America and CBA entered into

Agreement 1 and CBA and Fast entered into Agreement 2, and that all parties

entered into Amendment 1. *Id.* at 2. Amendment 2 again reduced the purchase

price of the airplane due to additional delays. *Id.* Amendment 2 required Piaggio to

deliver the airplane to CBA so that CBA could immediately deliver the airplane to

Fast Enterprises. *Id.* Like Amendment 1, Amendment 2 was signed by

representatives of each of the three parties. *Id.* at 3.

In accordance with Agreement 1, Piaggio delivered the airplane to CBA in

Kansas on December 20, 2013. Dkt. 97-32 at 4. CBA then transported the airplane

to Texas, where Fast took possession. Dkt. 96 at 2. The airplane was put into use

by Plaintiffs in late January 2013, just days before the incident in Springfield,

Illinois. *Id.* at 2-3.

## C.     The Dispute

After the incident and the conclusion of the FAA's investigation, Plaintiffs provided Piaggio and CBA with a notice rejecting the airplane as a non-conforming good and that Plaintiffs were revoking acceptance under the Uniform Commercial Code. *Compl*., Dkt. 1-3 at 8. Plaintiffs also provided notice that they were rescinding the back-to-back sales agreements under which the airplane was purchased. *Id.* Plaintiffs also demanded return of payment and other expenses. *Id.* Plaintiffs originally made the airplane available for re-delivery to Piaggio or CBA, but the record indicates Plaintiffs eventually sold the airplane in 2018.

In this action, Plaintiffs bring the following claims against Piaggio: breach of contract; breach of express warranty; breach of implied warranty of merchantability; breach of implied warranty of fitness for a particular purpose; rejection of non-conforming goods; revocation of acceptance; negligence; product liability; strict liability; and unjust enrichment. *See Sec. Am. Compl.*, Dkt. 79.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24,

(1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327, 106 S.Ct. 2548. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, (1986). There must be a genuine dispute as to any *material* fact—a fact "that may affect the outcome of the case." *Id.* at 248.

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001). The filing of cross-motions for summary judgment—where both parties essentially assert that there are no material factual disputes—does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### I.     Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for the Court enter partial summary judgment in their favor on the issue of defect. Dkt. 95. Specifically, Plaintiffs argue that the undisputed facts show the airplane subject to this action was defective at the time it was delivered by Piaggio, and thus was defective when it came into Plaintiffs' possession. Dkt. 95-1 at 2.

Under Idaho law, a plaintiff asserting a products liability claim bears the burden of proving (1) injury by the product; (2) that the injury was the result of a

defective or unsafe product; and (3) that the defect existed with the product left the control of the manufacturer. *Massey v. Conagra Foods, Inc.*, 328 P.3d 456, 460 (Idaho 2014) (citing *Farmer v. Int'l Harvester Co.,* 553 P.2d 1306, 1310-11 (Idaho 1976)). Notably, Plaintiffs' motion does not seek summary judgment on the entirety of the prima facie products liability case. Instead, Plaintiffs ask the Court to find there is no genuine issue of material fact the defect existed when the airplane left the control of Piaggio.

The presence of a product defect is determined on a case-by-case basis. *Farmer* at 1311. "A prima facie case [of defect] may be proved by direct or circumstantial evidence of a malfunction of the product and the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant. Reasonable inferences are permissible in determining whether a product was defective." *Stanley v. Lennox Indus., Inc.*,102 P.3d 1104, 1107 (Idaho 2004). Notably, "[a] circumstantial evidence showing … [requires] proof of: (1) the malfunction of the product; (2) the lack of evidence of abnormal use; and (3) proof excluding the possibility of other 'reasonable causes.'" *Id.* (quoting *Doty v. Bishara,* 848 P.2d 387, 390 (1992). Circumstantial evidence invites the trier of fact to infer a defect.

**A.    Evidence of a Malfunction of the Hydraulic System**

In this case, Plaintiffs point to ample, undisputed evidence of the malfunction of the aircraft's hydraulic system. The landing gear of the airplane is operated by a hydraulic system. *Nat'l Transportation Safety Board Aviation Accident Factual Report*, Dkt. 95-4 at 6. A critical component to the use of the system is the directional control valve. *Id.* That valve controls the flow of hydraulic fluid, and, the directional flow of hydraulic fluid moves the landing gear from a "gear up" closed position, to a "gear down" position necessary for landing. *Id.* When preparing to land in Springfield, Illinois, the pilots pressed the control switch to move the landing gear into its "gear down" position. *Id.* at 2. Despite being in the "gear down" switch position, the landing gear remained in a "gear up" position. *Id.* The pilots' initiated emergency procedures to manually override the hydraulic system. *Id.* This entailed turning the hydraulic system off completely so that they could manually pump the landing gear into a "gear down" position for landing. *Id.* at 6.

When the airplane's hydraulic system was inspected by the FAA, it was determined that a metallic particle in the closed hydraulic system caused a jam, resulting in the constant one-directional flow of hydraulic fluid and a constant "gear up" position. *Id.* at 9. Thus, given the condition of the hydraulic system, the only way to operate it was through the manual emergency process. *Id.* "About 60

hand pump strokes over about 90 seconds are required for a positive down lock of all landing gear." *Id.* at 6.

Defendant argues that, because the manual emergency process worked without incident, the landing gear was not defective. However, that argument glosses over the significant fact that the system did not function as designed or intended—it malfunctioned and thus out-of-the ordinary emergency procedures were employed by the pilots. The emergency procedure necessitated rapid hand pumping to successfully lower the landing gear. Further, to implement the emergency procedure, pilots had to completely shut off the hydraulic system, a decision that disabled other key safety features—power steering and power braking capabilities. Defendant argues also that, the determination of whether the aircraft was defective "calls for a legal conclusion and expert opinion" not provided by Plaintiffs. Dkt. 105 at 11. However, Idaho law does not require a plaintiff to provide expert testimony to establish defect. *Jensen v. Am. Suzuki Motor Corp.*, 35 P.3d 776, 780-81 (Idaho 2001). Further, the evidence here does not appear to be "so technical or difficult-to-follow that it cries out for expert interpretation." *Hansen-Rice, Inc. v. Celotex Corp.*, 414 F. Supp. 2d 970, 975 (D. Idaho 2006).

For the reasons stated above, the Court finds there is no genuine issue of material fact regarding the hydraulic system's malfunction just prior to the pilots' first attempt to land the airplane in Springfield, Illinois.

**B.      Absence of Evidence of Abnormal Use**

Similarly, Plaintiffs have shown there is an absence of evidence of abnormal use of the hydraulic system from the time the airplane arrived in the United States through the date of the incident. There is no evidence in the record indicating or hinting at abnormal use of the hydraulic landing gear prior to the Springfield landing. *See* Dkt. 95-1 at 6. Defendants argue Plaintiffs cannot carry their burden to show lack of abnormal use based solely on the fact that no incidents of abnormal use were reported. The Court does not agree – that is precisely how a plaintiff would show a lack of abnormal use. Thus, the burden shifts to Defendant to raise a genuine issue for the jury as to the issue. Defendants cite no evidence of potential abnormal use of the hydraulic system or the airplane prior to the Springfield, Illinois landing attempt. Defendants assert that "four experts have tendered reports regarding the nature and extent of pilot error that caused the gear to retract and the ensuing property damage to occur." Dkt. 105 at 14. However, this argument conflates the issue of whether the defect *caused* the gear retraction after landing with the question of whether there was a defect in the landing gear. As such, the Court finds there is no genuine issue of material fact as to the issue of abnormal use.

**C.    Absence of Evidence of Reasonable Secondary Causes**

Finally, to prove defect, Plaintiffs are required to show there is an absence of evidence of reasonable secondary causes for the malfunction. To this end, both Plaintiffs and Defendant begin to conflate the issues of whether the landing gear malfunction was caused by something other than a defect with the separate factual issue of when the particle may have been introduced into the hydraulic system— i.e. the source of the particle. The Court need look only to the report of the NSTB and the FAA's investigation to conclude there is no genuine issue of material fact regarding the conclusion that the hydraulic landing gear system malfunctioned and was stuck in a "gear up" position because a foreign metal fragment jammed the components that controlled the flow of hydraulic fluid. This same information and conclusion is contained in an expert report provided by Defendant: "A foreign object jammed in the directional control valve causing the valve to stick in the retract position making it impossible to extend the landing gear normally." (*McFall Dep.*, Dkt. 105-2 at 16).

In sum, the Court finds there is no genuine issue as to whether the hydraulic landing gear system was defective. Thus, with defect so established, the analysis shifts to the question of whether there is a genuine issue of material fact that the defect existed when the product left the control of the manufacturer.

**D.     Existence of Defect When Airplane Left Control of Manufacturer**

Importantly, there is no evidence that the product, the hydraulic pump, was modified after it left the control of the manufacturer in Italy. Defendant argues that there are genuine issues of material fact as to whether the defect existed at the time the airplane was delivered because the origin of the metallic particle in the hydraulic system is unknown, and thus it is reasonable to assume that the particle was introduced after delivery by a third party. *Id.* at 5. Defendant offers no evidence and no theory for how the foreign particle could have been introduced into the closed hydraulic system after manufacture or after the airplane left Defendant's control in Texas. Defendant asserts that "the metallic particle was of a different composition than any other metal used on the Aircraft." Dkt. 105 at 5. But, that broad assertion misses the mark.  It is true, that the NSTB report stated that, the FAA's "review of materials used in the directional control valve did not match the material composition of the trapped particle." *Id.* at 10. The real question, however, is how this foreign item found its way into the directional control valve.  Defendants have offered no evidence, or any theory, as to how the particle could have been introduced post-delivery by a third party, so soon after it was delivered to the purchaser.  The only reasonable conclusion a jury could reach is that the fragment was present on delivery.

Finally, Piaggio raises issue with Plaintiffs' request that the Court find the entire aircraft was defective at the time of delivery—asserting any such finding, if made, must necessarily be limited to the hydraulic system. The Court agrees and will so limit its conclusion that there is no genuine issue of material fact that the foreign metal particle in the closed hydraulic system was a defect present upon delivery of the airplane by Piaggio. For the foregoing reasons, the Court will grant Plaintiffs' Motion for Partial Summary Judgment as so limited.

## II.     Defendant's Motion for Summary Judgment

The Court turns now to Defendant's motion for summary judgment or partial summary judgment against Plaintiffs. Defendant agues Plaintiffs alleged "patently untrue 'facts'" to survive Defendant's motion to dismiss, and that now, the record contains sufficient undisputed facts to show Plaintiffs' allegations are untrue. Defendant's motion is divided into five arguments. The Court will analyze the merits of each argument in turn.

### A.     Waiver of Claims

Defendant first argue that Plaintiffs' claims fail as a matter of law because Plaintiffs released and waived the right to bring any claims against Piaggio America, Inc. except for a limited warranty claim. (Dkt. 97 at 6-7.) Defendant argues the sales agreement between CBA and Fast, Agreement 2, required Fast to waive and release "all rights, claims, and remedies" related to the airplane, except

a limited warranty provision. *Id.* at 7. Defendant asserts the broad release was not specific to claims against CBA, but that it applies generally to waive all rights, claims, and remedies that Plaintiffs could bring related to the airplane, including claims against Piaggio America, Inc.

The waiver language underlying Defendant's argument is as follows:

**THE WARRANTIES SET FORTH IN APPENDIX B OF THE SPECIFICATION ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES (EXCEPT FOR THE WARRANTY OF TITLE) AND REPRESENTATIONS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS (INCLUDING FITNESS FOR A PARTICULAR PURPOSE) RELATED TO THE AIRCRAFT OR ANY MODIFICATIONS, REPAIRS, REPLACEMENT PARTS, OR SERVICE CHANGE KITS WHICH MAY BE FURNISHED BY CBA OR PIAGGIO TO BUYER FOR USE ON THE AIRCRAFT.** Except for the obligations expressly undertaken by CBA in this Agreement and the warranties set forth in Appendix B of the Specification and the Bill of Sale with respect to the Aircraft in the form attached as Appendix C, BUYER hereby waives and releases for itself and its insurers (through subrogation or otherwise) all rights, claims, and remedies with respect to any and all warranties, express, implied, or statutory (including, without limitation, any implied warranties of merchantability and fitness, including fitness for a particular purpose), duties, obligations, and liabilities of tort or contract arising by law or otherwise, including (1) strict liability or product liability, (2) any obligations of CBA with respect to incidental or consequential damages, damages for loss of use, or damage relating to the market value of the Aircraft. BUYER acknowledges and agrees to the terms, conditions and exclusions (including without limitation, destruction of the Aircraft beyond economical repair) of the Warranty set forth in Appendix B of the Specification. This disclaimer shall not be interpreted to expand BUYER'S remedies beyond those set forth in Section 6.C. of the attached Terms and Conditions or to affect in any

way CBA's obligations, if any, for third party claims tor property
damage, personal injury, or wrongful death.

*Agreement 2*, Dkt. 97-10 at 4-5.

Based on this language, Fast appears to have waived rights, remedies, and

express and implied warranties, as well as strict liability and products liability

claims as to CBA. Such waiver likely would have foreclosed many of the claims

made by Fast against CBA. The question becomes, however, whether Piaggio can

claim the benefit of such waivers as a third-party beneficiary of Agreement 2.

Although Piaggio was not a party to Agreement 2, Piaggio asserts it has the

legal right and ability to benefit from and enforce the waiver provision as a third-

party beneficiary. Dkt. 97 at 8; citing Idaho Code § 29-102. As such, Piaggio

asserts Plaintiffs' only remedy in this action is the repair or replacement of the

defective part—the hydraulic power pack. Dkt. 97 at 8.

> Under Idaho law [I.C. § 29–102], if a party can demonstrate that a
> contract was made expressly for its benefit, it may enforce that contract,
> prior to rescission, as a third-party beneficiary. The test for determining
> a party's status as a third-party beneficiary capable of properly invoking
> the protection of I.C. § 29-102, is whether the agreement reflects an
> intent to benefit the third party. The third party must show that the
> contract was made primarily for his benefit, and that it is not sufficient
> that he be a mere incidental beneficiary. Further, the contract itself must
> express an intent to benefit the third party. This intent must be gleaned
> from the contract itself unless that document is ambiguous, whereupon
> the circumstances surrounding its formation may be considered ... a
> party must show that the contract was made for its direct benefit, and
> that it is not merely an indirect beneficiary.

*Idaho Power Co. v. Hulet,* 90 P.3d 335, 337–38 (Idaho 2004) (internal citations and quotations omitted).

Thus, to establish itself as a third party beneficiary of Agreement 2, Piaggio must show that Agreement 2 was made primarily for its benefit. In other words, the agreement itself must clearly express an intent to benefit Piaggio America, Inc.

Agreement 2 identifies the Seller as "Charlie Bravo Aviation, LLC," the Buyer as "FAST ENTERPRISES," and the Manufacturer as "Piaggio." *Agreement 2*, Dkt. 97-10 at 3. The agreement sets out the purchase price for the airplane, the payment schedule, and the schedule for delivery. *Id.* The agreement also sets out the "interior definition process" allowing Fast to "define the interior" of the plane to its specifications. *Id.* at 4. The agreement states that, "CBA and BUYER" acknowledged that all terms and conditions as well as attachments and appendices were expressly incorporated into the agreement. *Id.*

The agreement is signed by a representative for CBA and a representative for Fast. *Id.* at 5. Attached to Agreement 2 are Terms and Conditions. *Id.* at 6-7. The Terms and Conditions specifically mention "Piaggio" in the following ways. First, under a section entitled "Inspection and Delivery" that CBA would tender the airplane for inspection "at PIAGGIO's Completion Facility," and that Fast Enterprises would complete its inspection within five days after the airplane being "tendered by PIAGGIO." 97-10 at 6. Second, in a section entitled "training," the terms and conditions detail that CBA would provide instruction for two pilots and

one maintenance person at "Flight Safety International … unless otherwise specified by PIAGGIO" and that Piaggio would be responsible for all costs of instruction and training during the specified training period. *Id.* Piaggio is not specifically mentioned anywhere else in Agreement 2.[1]

Piaggio argues that other terms in Agreement 2 were necessarily intended to benefit Piaggio, including that Plaintiff waived all product liability and strict liability claims. Dkt. 97 at 8. Piaggio argues that CBA could not be subject to product liability or strict liability claims as a broker to the sales agreements, only. *Id.*

The fact that "Piaggio" is identified as the "manufacturer" of the airplane within Agreement 2 is significant in regard to this motion for summary judgment. In Defendant's response to Plaintiffs' Motion for Partial Summary Judgment, Piaggio (Piaggio America, Inc.) is careful to point out that it is not the manufacturer of the airplane—instead it acted solely as a sales agent and customer service provider for Piaggio Italy, the manufacture of the airplane.[2] Dkt. 97 at 22.

---

[1] The Court notes the substantial similarities between Agreement 1, the sales agreement executed by "Piaggio America, Inc." and "Charlie Bravo Aviation" and Agreement 2. However, the similarities do not resolve questions of fact regarding which "Piaggio" Agreement 2 was meant to reference.

[2] "Looking specifically to the Aircraft at issue, it is undisputed that it was manufactured by Piaggio Aero Industries, S.p.A. in Genoa, Italy, as demonstrated by the U.S. FAA's Standard Airworthiness Certificate and the U.S. FAA's Aircraft Statement of Conformity"; and "[i]t is undisputed that Piaggio has "never manufactured a Piaggio P.180 Avanti II aircraft [because it] (Continued)

Notably, if a contract is found to be ambiguous, courts hesitate to grant summary judgment. *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303 (9th Cir. 1997). Differing views on the intent of the parties at the time of contracting raise genuine issues of material fact. *Id.*; *See also Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993).

> When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law. An unambiguous contract will be given its plain meaning. The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. In determining the intent of the parties, this Court must view the contract as a whole. If a contract is found ambiguous, its interpretation is a question of fact. Whether a contract is ambiguous is a question of law. A contract is ambiguous if it is reasonably subject to conflicting interpretations.

*Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Tr.*, 177 P.3d 955, 960 (Idaho 2008).

Piaggio, the sales and customer service agent, argues it is a third-party beneficiary to Agreement 2, which clearly identifies "Piaggio" as the "manufacturer." This issue alone creates ambiguity and gives rise to questions of fact for the jury regarding which "Piaggio" CBA and Fast Enterprises intended to reference within Agreement 2.

---

is a sales and customer support entity." *Piaggio America's Memorandum in Support of Summary Judgment or Partial Summary Judgment*, Dkt. 97 at 22.

Furthermore, as detailed above, Defendant argues that several of the provisions in Agreement 2 "have no applicability other than providing Piaggio with a benefit." Dkt. 97 at 9. To illustrate the point, Defendant points to the waiver of product liability and strict liability claims against CBA. *Id.* Defendant argues such waiver could only be intended to benefit "Piaggio or Piaggio Aero Industries, S.p.A." *Id.* Yet, Defendant's argument forecloses the result it seeks. If the waiver provisions could be for the benefit of either Piaggio America or Piaggio Italy there is a question of unresolved fact—whether the purported third-party beneficiary was Piaggio America or the manufacturer, Piaggio Italy, or both.

For the foregoing reasons, the Court finds Defendant has failed to show there is no genuine issue of material fact regarding whether the waiver in Agreement 2, and other terms and conditions therein, were made for Piaggio America, Inc.'s benefit. As such, the Court will deny the motion for summary judgment.

**B.     Contractual Privity Between Piaggio America and Fast Enterprises**

Piaggio next contends that Fast and Peregrine are not in contractual privity with Piaggio, and as a result, summary judgment should be granted to Defendant on a majority of Plaintiffs' claims. Dkt. 97 at 9.  Piaggio argues, that, for privity to exist, an entirely new agreement regarding delivery of the airplane from Piaggio to Fast must exist. *Id.* Piaggio argues Fast is only in privity with CBA. Notably, the

Court addressed the issue of privity at the motion to dismiss stage. At that time, the parties disagreed over which agreement, if any, existed between Fast and Piaggio. The Court stated it was "confronted by a four-part agreement between the parties, the exact meaning of which is unclear." *Memorandum and Order*, Dkt. 91 at 6.

Under Idaho law, "privity" generally references "those who exchange the [contractual] promissory words or those to whom the promissory words are directed." *Wing v. Martin*, 107 Idaho 267, 272, 688 P.2d 1172, 1177 (1984). "A party must look to that person with whom [the party] is in a direct contractual relationship for relief in the event that his expectations under the contract are not met. *Id.*

Given that guidance, the Court turns back to the agreements at issue. Agreement 1 sets forth a direct contractual relationship between the signatories, Piaggio and CBA. Agreement 2 sets forth a direct contractual relationship between the signatories, CBA and Fast. Amendments 1 and 2 create a direct contractual relationship between the signatories, Piaggio, CBA, and Fast. Thus, as to Amendment 1 and Amendment 2, Piaggio and Fast were in contractual privity.

Plaintiffs' argument that Amendment 2 created privity between Piaggio and Fast starts out with the following language: "Both Amendments, and what commitments Piaggio made in them, must be viewed in the context of the facts that drove their creation as well as what happened afterword." Dkt. 106 at 13. In

contending there is no contractual privity between it and Fast, Piaggio makes this argument: "The undisputed facts show that Piaggio did not ever contemplate—much less intend—that CBA was being cut out of the deal through" Amendment 2. Dkt. 97 at 14. And further on, "Piaggio was not intending on doing anything other than 'amending'" the sales agreements and Amendment 1 when it entered into Amendment 2.

As at the motion to dismiss stage, the Court is *still* confronted with the four-part agreement between the parties, the exact meaning of which is unclear. As is evidenced by the parties' arguments, they openly disagree as to what was *intended* by Amendment 1 and Amendment 2 in relation to Agreement 1 and Agreement 2 and the modification of the duties and responsibilities of each party thereunder. What is clear to the Court from the pages of briefing on the privity issue is that there are differing views on the intent of the parties at the time of contracting. These differing views raise genuine issues of material fact and preclude entry of summary judgment.

## C.    Rejection and Revocation Claims

Piaggio contends it is entitled to summary judgment on Plaintiffs' rejection claim because the undisputed facts show Plaintiffs accepted delivery of the aircraft. Dkt. 97 at 20 (citing Idaho Code § 28-2-607). Piaggio argues that, under Idaho law, rejection of goods must occur before acceptance. *Id.* By putting the airplane into

service, it is argued, Fast accepted the airplane. The section of Idaho Code cited by Piaggio states that, "[a]cceptance of the goods by the buyer precludes rejection of the goods accepted if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonable cured…" Here, there is no allegation or facts that suggest Fast or any agent acting on its behalf accepted the airplane with knowledge of the defect in the landing gear. Piaggio cites no other law or authority for this argument.

Piaggio argues also that the lack of a buyer-seller relationship between Plaintiffs and Piaggio is dispositive of the revocation claim because a buyer may revoke acceptance only against the seller and Plaintiffs are not in privity with Piaggio. *Id.* at 21 (citing Idaho Code § 28-2-607). However, as set forth above, there are genuine issues of material fact foreclosing summary judgment in Piaggio's favor as to the privity question.

Finally, Piaggio argues the revocation claim also fails because, under Idaho law, revocation of acceptance must occur before a substantial change in the condition of the goods not caused by their own defects. *Id.* Piaggio asserts that Plaintiffs "did not revoke acceptance until after damaging the aircraft." *Id.* Piaggio's second argument is foreclosed by a material fact in dispute in this case:

whether the damage to the airplane was caused by pilot error or due to the defect in the hydraulic landing gear system.

## D. Negligence Claim

Piaggio asserts it is entitled to summary judgment on Plaintiff's negligence claim because Piaggio took no part in the manufacture of the airplane. Dkt. 97 at 22. Piaggio argues also that, assuming Plaintiff's negligence claim is premised on the allegation that Piaggio breached some duty of care related to the sale of the airplane, there is no evidence in the record to support the claim.

In response, Plaintiffs assert Piaggio is liable for negligence under Idaho Code as a product seller who is "a wholly-owned subsidiary of the manufacturer, or the manufacturer is a wholly-owned subsidiary of the produce seller." Dkt. 106 at 20 (citing I.C. § 6-1407(d)). Indeed, the Court has recognized that Piaggio America is a wholly-owned subsidiary of Piaggio Italy.[3] Given that legal principle, Plaintiff's claim is that Piaggio America is liable for Piaggio Italy's negligent design or manufacture of the plane, not upon some theory related to negligence in the sale of the plane. For these reasons, the Court will deny the motion for summary judgment as to the negligence claims.

---

[3] "[A]s Fast points out, § 6-1407's bar on liability is excepted where "[t]he product seller is a wholly-owned subsidiary of the manufacturer, or the manufacturer is a wholly-owned subsidiary of the product seller." I.C. § 6-1407(d). Piaggio, in its corporate disclosure, stated, "Piaggio is a wholly owned subsidiary of Piaggio Aero Industries Spa, an Italian corporation." Dkt. 2 at 2. Thus, section 6-1407 does not bar Fast's product liability claim." Dkt. 91 at 11.

## E.    Unjust Enrichment Claim

Finally, Piaggio asserts that Plaintiffs' unjust enrichment claim fails as a matter of law because Plaintiffs did not confer any benefit on Piaggio, and, even if they had, such benefit was not unjust. Dkt. 97 at 23.

A party is unjustly enriched when it receives a benefit that would be inequitable to retain without compensating the party that conferred the benefit. *Vanderford Co. v. Knudson*, 165 P.3d 261, 271 (Idaho 2007). A party must show three elements to establish a prima facie case for unjust enrichment: that plaintiff conferred a benefit upon the defendant; that the defendant appreciated the benefit; and that the circumstances are such that it would be inequitable for the defendant to retain the benefit without compensating the plaintiff for its value. *Id*.

Defendant argues no benefit was conferred by Plaintiffs on Piaggio because Plaintiffs paid CBA the full purchase price of the airplane under Agreement 2. The subsequent benefit Piaggio received was from CBA, under Agreement 1. This sanitized recitation of the facts and the payment relationships between the parties is beguiling. The Court need only look to Amendment 1 and Amendment 2 to see that there was a direct relationship between the delays in the manufacturing process that would be attributed to Piaggio, and the ultimate payment they would receive due to reductions Piaggio was willing to make in the purchase price.

Next, Piaggio argues that, even assuming that Plaintiffs conferred a benefit on Piaggio, any such benefit was not inequitable. Piaggio argues that because National Union has already repaired and replaced the malfunctioning part, Plaintiffs have already been made whole from any potential injury resulting from a defect in the airplane itself. *Id.* Again, this argument omits important aspects of the claims in this case—including that Plaintiffs are seeking diminution in value damages related to the resale of the airplane. There are disputed issues of material fact that impact the viability of the unjust enrichment claims. As such, the Court will deny summary judgment on defendant's behalf as to the unjust enrichment claims.

## III. Defendant's Motion as to National Union

In a separate motion, seeks summary judgment against the claims of intervenor National Union Fire Insurance Company ("National Union"). Piaggio contends that National Union's claims are wholly derivative of the claims being brought by Plaintiffs, so that to the extent Piaggio prevails in its motion for partial summary judgment filed against Plaintiffs, the rulings in that order will directly impact and extinguish claims brought by National Union.

However, as stated in full detail above, the Court will deny Piaggio's motion for summary judgment in all respects. For this reason, the Court will also deny its motion for summary judgment or partial summary judgment as to National Union.

# CONCLUSION

In sum, the Court finds there is no genuine issue of material fact that a foreign metal particle in the enclosed hydraulic landing gear system constitutes a defect in the landing system under Idaho law. As such, the Court will grant Plaintiffs' Motion for Partial Summary Judgment. The Court finds however, that there are genuine issues of material fact that preclude the entry of summary judgment in favor of Defendant. Therefore, the Court will deny Defendants' motions for summary judgment in full.

# ORDER

**IT IS ORDERED that:**

1. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 95) is **GRANTED**.

2. Defendant's Motion for Summary Judgment or Partial Summary Judgment against Plaintiffs Peregrine Falcon LLC and Fast Enterprises LLC (Dkt. 97) is **DENIED**.

3. Defendant's Motion for Summary Judgment or Partial Summary Judgment Against Intervenor National Union Fire Insurance of Pittsburgh, PA (Dkt. 98) is **DENIED**.

DATED: March 4, 2020

B. Lynn Winmill
U.S. District Court Judge